UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| EDUARDO TOMEO, JERARDO CHAGOYA, JORGE A. RODRIGUEZ, and TAKEO OSHIMA, on behalf of themselves and all other similarly situated persons, | ) ) ) | 14 C 2431 |
| | ) | |
| Plaintiffs, | ) | Judge Gary Feinerman |
| | ) | |
| vs. | ) | |
| | ) | |
| W&E COMMUNICATIONS, INC., and JORGE CHIRINOS, | ) ) | |
| | ) | |
| Defendants. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Eduardo Tomeo, Jerardo Chagoya, Jorge Rodriguez, and Takeo Oshima brought this collective action against W&E Communications, Inc. and Jorge Chirinos, alleging that W&E's payroll policies and practices violate the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*  Doc. 30.  Plaintiffs further allege, only on behalf of themselves, violations of the Illinois Minimum Wage Law ("IMWL"), 820 ILCS 105/1 *et seq.*, and the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1 *et seq.*  Earlier in the case, the court conditionally certified the FLSA collective and authorized notice to employees who were similarly situated to Plaintiffs.  Docs. 55-56.  Defendants later filed a motion to decertify the collective, Doc. 99, which the court denied without prejudice in an oral ruling, Doc. 184.

Now before the court are Plaintiffs' summary judgment motion, Doc. 96; Plaintiffs' motion to strike Defendants' declarations, Doc. 120; and Defendants' motion to strike Plaintiffs' Local Rule 56.1 objections and for leave to amend their Local Rule 56.1 materials, Doc. 132. Plaintiffs' motion to strike is denied, Defendants' motion to strike and for leave to amend is denied as moot, and Plaintiffs' summary judgment motion is granted in part and denied in part.

## Background

### A.      Factual Background

The following facts are set forth as favorably to Defendants, the non-movants, as the record and Local Rule 56.1 permit. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). On summary judgment, the court must assume the truth of those facts, but does not vouch for them. *See Arroyo v. Volvo Grp. N. Am.*, 805 F.3d 278, 281 (7th Cir. 2015).

#### 1.      W&E's Timekeeping and Compensation Practices

Plaintiffs worked as service technicians for W&E at various points between 2010 and 2014. Doc. 109 at ¶ 1. Tomeo's, Rodriguez's, and Oshima's jobs entailed installing and servicing cable television, phone, and Internet connections at commercial and residential locations in Illinois. *Id*. at ¶¶ 1, 3, 7. Chagoya did only residential installations. *Id*. at ¶¶ 1, 7.

At all relevant times, Jorge Chirinos ("Jorge") was W&E's Secretary. *Id*. at ¶ 4. He had the authority to: (1) hire and fire employees; (2) direct and supervise their work; (3) handle W&E's payroll accounts; and (4) make other decisions concerning employee compensation. *Ibid*. He was the person designated to receive notice under W&E's contracts, and he initialed and signed all contracts as "President" of W&E. *Id*. at ¶ 14. At times, Jorge acted as W&E's Operations Director and was in charge of its finances. *Id*. at ¶ 4.

The parties dispute the typical working hours for W&E technicians. Plaintiffs assert that they were required to arrive at work between 6:30 a.m. and 7:15 a.m. in order to attend meetings, receive trainings, or pick up equipment. Doc. 98 at ¶ 8. They further assert that, after leaving their last on-site jobs at the end of the work day, they often had to return to the W&E warehouse to drop off equipment. *Id*. at ¶ 10. Defendants deny some of these assertions, saying that W&E employees were required to arrive by 6:30 a.m. only on certain days and that they were allowed

to return equipment the following morning.  Doc. 109 at ¶¶ 8, 10 (citing Doc. 109-2 at ¶ 17).

They do not dispute, however, that on some days Plaintiffs had to visit the warehouse to start the

day to pick up and/or drop off equipment.  *Ibid*.  Insofar as the parties' versions of the facts

conflict, the court accepts Defendants' version.

Plaintiffs assert that their busy schedules typically prevented them from taking an

uninterrupted lunch hour.  Doc. 98 at ¶ 9.  Defendants dispute this, pointing to evidence that

W&E had a policy requiring technicians to take lunch if they worked over six hours and that no

technician ever complained about being unable to do so.  Doc. 109 at ¶ 9 (citing Doc. 109-5 at

¶¶ 10-11).  Technically, the parties' dueling narratives are consistent—W&E could have had a

mandatory lunch policy but, as a practical matter, employees could rarely have had time to break

from work.  But on summary judgment, all reasonable inferences must be drawn in the non-

movant's favor, and it is reasonable to infer that if W&E required employees to take lunch hours

and nobody complained about their not being able to do so, their work schedules allowed it.

W&E required technicians to record their hours accurately, and failure to do so was

grounds for termination.  *Id*. at ¶ 12.  During Plaintiffs' tenure, W&E tracked employees' hours

several different ways.  Technicians were always required to sign in on paper at the warehouse.

*Id*. at ¶ 15; Doc. 109-2 at ¶ 11.  From May 2013 to December 2013, they also were required to

clock in using a fingerprint machine.  Doc. 109 at ¶ 16; Doc. 109-2 at ¶ 13.  In December 2013,

W&E implemented PenguinData's mobile sign-in process, through which Plaintiffs could

electronically clock in and out of work using their mobile devices.  Doc. 109 at ¶ 17.  W&E

utilized a separate system called TechNet for technicians to log in and out when they started and

finished an on-site assignment.  *Id*. at ¶¶ 18-20.

Before December 2013, W&E paid Plaintiffs only for time spent in training and the time they logged while on-site at customer job locations, as tracked in TechNet. *Id*. at ¶ 30; Doc. 98-6 at 284-285. (The parties dispute whether training time was compensated, Doc. 109 at ¶ 30, but Defendants' position that it was finds support in the record and thus is credited, Doc. 98-6 at 284-85.) Plaintiffs were not compensated for the time spent at the warehouse picking up and returning equipment. Doc. 98-5 at 234-235; Doc. 109 at ¶¶ 8, 10, 25, 30; Doc. 109-2 at ¶ 17.

From February 2013 onward, Sandra Chirinos ("Sandra") tended to W&E's payroll. Doc. 109 at ¶ 26. Each week, she manually altered employee time records based on an audit, which consisted of: (1) checking each technician's timesheet history; (2) comparing the hours reported by each technician with the time frames recorded in W&E's system for each job that the technician completed; and (3) reconciling each audit against the hours paid by W&E's client. *Ibid*. To account for the required lunch breaks, Sandra would automatically deduct one hour from an employee's daily total if that employee had worked more than six hours. *Id*. at ¶ 43. Sandra avers that when she adjusted a technician's hours, she typically verified (either with the technician, the dispatcher, or a manager) that those were the actual hours worked. Doc. 98-5 at 245-247. Plaintiffs, by contrast, assert that Sandra did not verify a technician's actual hours before finalizing his or her timesheet. Doc. 109 at ¶ 27. That is plausible; on many occasions, Sandra's audits conveniently resulted in eliminating all of an employee's overtime wages. *Id*. at ¶ 28. For instance, James Babbit initially logged 59.44 hours for the week of March 2, 2014; Tomeo logged 54.86 hours for the week of February 16, 2014; and Rayard Herron 57.19 hours for the week of January 19, 2014. *Ibid*. For each of these weeks, Sandra reduced their hours to 40.00. *Ibid*. But at this stage of the case, when credibility disputes must be resolved in Defendants' favor, the court must accept Sandra's account of how she conducted the audits.

W&E's employee handbook provided that "employees must accurately record all work time on a daily basis unless not possible." Doc. 122 at ¶ 52. Nonetheless, technicians often failed to clock in at W&E's warehouse (through any of the available systems). Doc. 109 at ¶ 21; Doc. 98-6 at 696-702. W&E never suspended or terminated an employee for not logging his hours properly, though it reprimanded technicians for failing to do so. Doc. 109 at ¶ 22; Doc. 98-6 at 697; Doc. 109-5 at ¶ 8. The employee handbook further provided that "[i]f an employee notices an error or discrepancy in his/her paycheck or deposit, the employee should immediately notify his/her supervisor or Human Resources Representative," Doc. 122 at ¶ 51, and that "[i]f any improper deductions are found to have been made, W&E Communications Inc. will reimburse the employee for those improper pay deductions," *id*. at ¶ 55.

Plaintiffs assert that W&E told technicians they were paid "by the job" and that, as a result, they never appreciated the importance of accurately tracking their hours. Doc. 98 at ¶¶ 44-45 (citing, *e.g.*, Doc. 98-5 at 338-339, pp. 64-65; Doc. 98-6 at 119-120, pp. 63-65). But Plaintiffs' weekly pay sheets expressly stated that employees were compensated in part by "their set hourly rate." Doc. 109 at ¶ 35; *see also id*. at ¶ 41. Moreover, Tomeo testified that he knew that he was paid both by the job and by the hour. Doc. 98-6 at 19-20, pp. 72-75. Given this, and drawing all reasonable inferences in Defendants' favor, the court cannot conclude on summary judgment that employees were told they were paid only "by the job." Nonetheless, Defendants acknowledge, and the court therefore accepts as true, that at least some Plaintiffs failed to accurately track their own hours because they (mistakenly) believed they were paid by the job. Doc. 109 at ¶ 45.

## 2.     The PenguinData System

At all relevant times, W&E compensated Plaintiffs on a weekly basis in accordance with PenguinData's "production bonus pay method."  *Id*. at ¶¶ 24, 31.  Under that method, a technician's total compensation was divided into two components: base pay and bonus pay.  *Id*. at ¶ 31.  Base pay was calculated by multiplying a technician's set hourly pay rate by the number of hours worked.  *Ibid*.  If a technician worked more than forty hours in a given week, he received one-and-a-half of his hourly rate for all hours worked in excess of forty.  *Ibid*.  Base pay was guaranteed and not subject to any deductions.  *Ibid*.  The hourly rate paid to Plaintiffs was the Illinois minimum wage.  *Id*. at ¶ 41.

Determining bonus pay was more complex—and, as shown below, how it was computed changed over time.  W&E assigned a dollar value to each type of job performed by technicians.  *Id*. at ¶ 36.  Those values could be adjusted based on a technician's performance in a given week.  *Id*. at ¶ 39; Doc. 98-5 at 203-204.  Multiplying the rate for each task by the quantity of those tasks performed (and then summing those amounts across different tasks) yielded a technician's total production for the week.  *Id*. at ¶ 31.  For example, if a technician conducted five service calls and one installation, and the technician's rate for each service call was $100 while the rate for each installation was $75, then the total would be $575.  The parties call this figure different names.  *Compare* Doc. 97 at 7-8 ("Gross Production"), *and* Doc. 98 at ¶ 36 ("Jobcodes—Gross Production"), *with* Doc. 112 at 13 ("total production" or "net jobcode production").  To avoid confusion, this opinion henceforth will use the term "Gross Jobcode Production."

Once Gross Jobcode Production was determined, the technician's total base pay (including overtime) was then subtracted arrive at the production bonus, Doc. 109 at ¶ 31—in essence making the production bonus the amount earned in excess of base pay.  The production

bonus was then divided by the hours worked to provide an hourly production bonus rate. *Ibid*. Finally, the hourly bonus rate was applied to a technician's hours in the same way that the base pay hourly rate was; that is, the technician received the bonus rate for the first forty hours of work, and one-and-a-half times the bonus rate for each hour he worked in excess of forty. *Ibid*. This total bonus pay was then added to the technician's total base pay to calculate final compensation. *Ibid*.

Here is a hypothetical example of how the production bonus pay method worked. A technician works fifty hours in a given week. Her hourly rate is ten dollars. Accordingly, her base pay for the week is $400 for the first forty hours of work and $150 for the ten overtime hours, for a total of $550. Based on the number and types of jobs she completed that week, her Gross Jobcode Production is $1000. Her production bonus for that week is $450, the difference between her Gross Jobcode Production and her base pay. That production bonus is then divided by the fifty hours she worked, yielding a bonus hourly pay rate of $9. She then receives $360 in bonus pay for her first forty hours (forty multiplied by $9) and $135 for her ten hours of overtime (ten multiplied by $13.50), for a total of $495 in bonus pay. Her gross pay is the sum of her base pay ($550) and her bonus pay ($495), for a total of $1045. The following charts summarize the employee's hypothetical pay sheet:

*Step 1: Calculating Base Pay*

| Base Pay | | | |
|---|---|---|---|
| Type | Hours | Rate | Total |
| Regular | 40.00 | $10.00 / hr | $400.00 |
| Overtime | 10.00 | $15.00 / hr | $150.00 |
| | | **Total Base Pay** | $550.00 |

*Step 2: Calculating Gross Jobcode Production*

| Gross Jobcode Production | | | |
|---|---|---|---|
| Job Type | Quantity | Rate | Total |
| Service call | 5 | $100.00 per job | $500.00 |
| Custom work | 2 | $250.00 per job | $500.00 |
| Gross Jobcode Production | | | $1000.00 |

*Step 3: Calculating Production Bonus Pay Rate*

$1000.00 (Gross Jobcode Production) – $550.00 (Total Base Pay) = $450.00 (Production Bonus)

$450.00 (Production Bonus) ÷ 50 hours = $9.00 per hour (Bonus Pay Rate)

*Step 4: Calculating Bonus Pay*

| Bonus Pay | | | |
|---|---|---|---|
| Type | Hours | Rate | Total |
| Regular | 40.00 | $9.00 / hr | $360.00 |
| Overtime | 10.00 | $13.50 / hr | $135.00 |
| Total Bonus Pay | | | $495.00 |

*Step 5: Calculating Total Compensation*

$550.00 (Total Base Pay) + $495.00 (Total Bonus Pay) = $1045 (Total Compensation)

Three additional points concerning the PenguinData production bonus pay method warrant discussion.

First, at some point in the process, W&E could reduce a technician's pay for poor performance—for instance, if he lost a piece of equipment or failed to complete a job. Although the parties agree that these financial penalties were taken out of the employee's Gross Jobcode Production prior to calculating the production bonus, Doc. 109 at ¶ 31, the employees' pay sheets show that the deductions were actually made from final gross pay, Doc. 98-6 at 706-723. For purposes of this motion, that distinction is of no consequence—all that matters is that, at some point during the calculation of pay, deductions occasionally were made to penalize employees.

Sandra avers that W&E obtained written consent forms from Plaintiffs authorizing W&E to make those deductions. Doc. 109 at ¶ 49; Doc. 109-5 at ¶¶ 21-22. But her declaration states that she could not locate the authorization forms. Doc. 109-5 at ¶ 22. Those two statements are not inconsistent; therefore, the court credits both of them.

Second, in April 2013, W&E changed how it calculated the Gross Jobcode Production value. Doc. 98-7 at 27; Doc. 109 at ¶¶ 36-38. Rather than assigning dollar values to each job type, W&E began assigning points. Doc. 98-7 at 27; Doc. 109 at ¶ 37. The sum of those points was multiplied by a dollar figure to yield Gross Jobcode Production. Doc. 98-7 at 27; Doc. 109 at ¶¶ 38-39. The dollar figure was determined by the employee's performance grade for the week. Doc. 109 at ¶ 39. If the employee received a Grade A, the dollar value per point would be $1.45; for Grade B, $1.25; for Grade C, $1.18; and for Grade D, $0.92. *Ibid*. Defendants assert that W&E used this method of calculating the Gross Jobcode Production for certain residential technicians only from June 2013 to October 2014, but they support that assertion by citing paragraphs 6-8 and exhibits B-D of Sandra's October 22, 2015 declaration, *id*. at ¶ 36, and those paragraphs and exhibits do not exist, Doc. 109-11. The court therefore rejects Defendants' assertion regarding the duration of this practice.

Third, Defendants go to great lengths in their Local Rule 56.1(b)(3)(B) response to distinguish among certain categories of technicians—residential vs. commercial, senior vs. junior, bonus-eligible vs. non-bonus-eligible—with the implication that not all technicians were paid under the production bonus pay method. Doc. 109 at ¶¶ 1, 7, 9, 15, 36-39. But Defendants' summary judgment brief admits that Plaintiffs were paid under that system. Doc. 112 at 8 ("Plaintiffs' weekly wages are determined using a system called the PenguinData production bonus pay method."). What is more, Plaintiffs' timesheets all indicate that they were

compensated using the production bonus pay method.  Doc. 98-6 at 706-726.  It follows that Plaintiffs indisputably were paid according to that method.

Plaintiffs assert that W&E implemented the production bonus pay method without any inquiry into whether it violated the law.  Doc. 98 at ¶ 32.  But Jorge avers that Michael Enters, PenguinData's chief operating officer, and Jeremy Peck, PenguinData's president, assured him in 2008 that they had years of experience dealing with labor laws and that the production bonus pay method was the industry standard and legally compliant.  Doc. 109-2 at ¶¶ 7-8.  Moreover, PenguinData CFO Scott Craine told W&E that the production bonus pay method complied with the FLSA.  Doc. 109 at ¶ 34; Doc. 98-7 at 2-13.  On summary judgment, the court must accept Jorge's averments.  Plaintiffs cite an internal email written by Craine, which said that "W&E may not even understand how they pay their techs," as evidence that W&E did not adequately comprehend how the system worked.  Doc. 109 at ¶ 33.  Defendants do not dispute that Craine said that, but they correctly note that his statement does not suffice to indisputably establish that W&E did not, in fact, understand how the system worked.  *Ibid.*

**B.**　　**Plaintiffs' Motion to Strike Defendants' December 15, 2015 Declarations**

Defendants' Local Rule 56.1(b)(3)(B) response and Local Rule 56.1(b)(3)(C) statement of additional facts extensively cite the December 15, 2015 declarations of Jorge, Sandra, and William Perez, another W&E higher-up.  Doc. 109.  Plaintiffs move to strike those declarations as violating the rule against sham affidavits.  Doc. 120.

The sham affidavit rule provides: "When a conflict arises between a plaintiff's sworn testimony and a later affidavit or declaration, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a

plausible explanation for the discrepancy." *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 759 (7th Cir. 2006) (internal quotation marks omitted); *see also Abraham v. Wash. Grp. Int'l, Inc.*, 766 F.3d 735, 741 (7th Cir. 2014) ("[A] deponent may not use an affidavit sworn to after a deposition to contradict deposition testimony without giving a credible explanation for the discrepancies."). "The rule is designed to avoid sham factual issues and prevent parties from taking back concessions that later prove ill-advised." *United States v. Funds in the Amount of $271,080*, 816 F.3d 903, 907 (7th Cir. 2016) (internal quotation marks omitted). The Seventh Circuit has stressed that "in light of the jury's role in weighing credibility, this rule is to be used with great caution." *Ibid.* (internal quotation marks omitted); *see also Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 571 (7th Cir. 2015) ("This principle must be applied with great care, though, because summary judgment is not a tool for deciding questions of credibility.").

Plaintiffs contend that *Fischer v. Avanade, Inc.*, 519 F.3d 393 (7th Cir. 2008), establishes the additional proposition that a court must strike declarations that merely *supplement* a witness's prior testimony. Doc. 120 at 2-3. That is incorrect; in fact, *Fischer* held precisely the opposite. When confronted with a declaration that more completely addressed an issue first raised in the declarant's deposition, *Fischer* reasoned that the "more fulsome testimony in [the declarant's] declaration cannot be said to contradict his earlier, curt response at his deposition," and thus held that the declaration should not be stricken. 519 F.3d at 407. Therefore, the court will strike a declaration only insofar as it directly contradicts the declarant's earlier deposition testimony. *See Castro*, 786 F.3d at 572 ("[A]n affidavit can be excluded as a sham only where the witness has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact.") (internal quotation marks omitted).

Jorge's December 15, 2015 declaration does not contradict his deposition testimony.

Jorge was questioned at his deposition about W&E's methods for tracking employee time and its use of PenguinData. The following exchange occurred:

> Q. What is PenguinData?
>
> A. I am not prepared to talk about PenguinData because that's—somebody else was supposed to talk about PenguinData. But I recognize it as a—as a software.
>
> Q. Okay. And, yeah, I see that PenguinData is identified in 6 and 8. So I can ask the other witness about that.
>
> …
>
> Q. How does W&E track technicians' time?
>
> A. I wasn't ready to testify about that if somebody else is going to be doing that part.
>
> Q. Okay.
>
> A. But I am aware that we use a system.
>
> Q. Okay. Okay. I'll cover that with the other Rule 30(b)(6) witness.

Doc. 120-1 at 87-88. Plaintiffs seek to strike Jorge's declaration because it discusses PenguinData and employee time tracking. Doc. 120 at 3-4. So it does. Doc. 109-2 at ¶¶ 6-15. But none of Jorge's averments contradict anything in his deposition. In fact, he did not substantively testify regarding PenguinData and employee tracking at all, and instead deferred those questions to another witness. That does not preclude Jorge from submitting a declaration addressing those matters after having done his homework. *See Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1007 (7th Cir. 1999) ("[W]here the deposition testimony is ambiguous or incomplete, as it is here, the witness may legitimately clarify or expand upon that testimony by way of an affidavit."); *Noone v. Presence Hospitals PRV*, 149 F. Supp. 3d 904, 911 (N.D. Ill. 2015) ("Because the deposition indicates nothing more than a lapse of memory, the court will

consider the affidavit ….") (internal quotation marks and citation omitted); *Gibbs v. G.D. Searle Co.*, 2000 WL 960744 (N.D. Ill. July 10, 2000) ("It is 'hard to remember' does not mean 'I can't or won't remember.'").

The case for striking Sandra's declaration is even weaker. Without pointing to any specific contradictory averment, Plaintiffs complain that while "Sandra generally acted confused and pled ignorance as to several items" during her deposition, her subsequent declaration "contains information regarding these topics with far greater specificity than that disclosed … during the deposition." Doc. 120 at 5. In support, Plaintiffs cite portions of her deposition where she answered questions concerning time audits, technician pay, PenguinData, and pay deductions. *Ibid.* (citing Doc. 98-5 at 229-33, 244-48, 265-66). The court has reviewed those passages and finds that her testimony does not contradict her declaration. Plaintiffs insist that "Sandra's ability to suddenly and specifically articulate items that months before remained so muddled in her deposition testimony is highly suspect, and no weight should be given to any of its contents." *Ibid.* But on "summary judgment, a court can neither make a credibility determination nor choose between competing inferences." *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1041 (7th Cir. 1993); *see also Fischer*, 519 F.3d at 407 (refusing to strike the declarant's "more fulsome" declaration even though the belated emergence of the additional details it contained "raise[d] credibility concerns" that a jury would have to resolve).

Plaintiffs similarly object to Perez's declaration on the ground that it improperly "supplements [his] answers to lines of questioning explored during his deposition." Doc. 120 at 6. The only disputed portion of the declaration avers that Perez "personally interviewed Plaintiffs Jerardo Chagoya and Eduardo Tomeo after they applied for jobs at W&E" and that he "told them that, if W&E hired them, they would be paid hourly and would be eligible to receive a

production bonus." Doc. 109-13 at ¶ 4. That averment does not contradict Perez's deposition testimony, in which he stated that he was generally aware of (but not personally involved in) W&E's payroll practices and that he was familiar with the term "production bonus," but that PenguinData was responsible for calculating payments to technicians. Doc. 98-5 at 302-303, pp. 48-50.

For these reasons, Plaintiffs' motion to strike Jorge's, Sandra's, and Perez's December 15, 2015 declarations is denied.

**C.     Plaintiffs' Objection to Defendants' Local Rule 56.1(b)(3)(B) Response and Local Rule 56.1(b)(3)(C) Statement**

Plaintiffs object to Defendants' Local Rule 56.1(b)(3)(B) response and Local Rule 56.1(b)(3)(C) statement, arguing that "Defendants provide[] lengthy narratives, in addition to faulty evidentiary citations, extensive non-responsive factual argument, and additional factual statements." Doc. 122 at 2. Plaintiffs also argue that parts of Defendants' Local Rule 56.1 materials are "void of citation" and "misrepresent the record." *Ibid*. It would be improper to strike Defendants' Local Rule 56.1 materials in their entirety due to defects with individual paragraphs. And in evaluating the summary judgment record, the court has ensured that each disputed factual assertion is supported by admissible evidence, and it considers only those responses that are pertinent to each disputed assertion. As this is part and parcel of the standard procedure for deciding a summary judgment motion, Plaintiffs' objections are denied to the extent they seek to strike Defendants' Local Rule 56.1(b)(3)(B) response and Local Rule 56.1(b)(3)(C) statement.

**D.     Defendants' Motion to Strike Plaintiffs' Objection to Their Local Rule 56.1 Materials and for Leave to Amend Those Materials**

Defendants in turn move to strike Plaintiffs' objections to their Local Rule 56.1 materials and request leave to amend those materials. Doc. 132. The motion to strike is denied as moot,

as the court has denied Plaintiffs' objections insofar as they sought to strike Defendants' materials. As for leave to amend, other than correcting several typos, the only change Defendants seek is to add a citation to another Sandra declaration to paragraphs 53 and 54 of their Local Rule 56.1(b)(3)(C) statement. *Id.* at ¶¶ 3-4; Doc. 132-1 at 38-39, ¶¶ 53-54 & nn. 7-8. The declaration is necessary, Defendants submit, to lay the foundation for other evidence. Doc. 132 at ¶ 3. But the facts in those paragraphs pertain only to the accuracy of Sandra's auditing practices, Doc. 132-1 at 38-39, ¶¶ 53-54, and, as discussed below, Defendants prevail on all claims relating to those practices even without considering Sandra's other declaration. The motion to amend therefore is denied as moot.

## Discussion

Plaintiffs assert that three aspects of W&E's payroll practices violate the FLSA and the IMWL. First, Plaintiffs allege that the production bonus pay method improperly calculates their statutorily mandated overtime wages. Doc. 97 at 5-9. Second, Plaintiffs claim that W&E's pre-December 2013 policy of not paying them for the time spent retrieving and returning equipment at the warehouse deprived them of their lawful compensation. *Id.* at 9-11. Third, Plaintiffs allege that W&E systematically altered their time sheets to reduce their compensable hours, further depriving them of their lawful compensation. *Ibid.* Plaintiffs also argue that, as a matter of law, Jorge is individually liable; the applicable FLSA statute of limitations is three years; and they are entitled to liquidated damages under the FLSA. *Id.* at 11-14. Finally, Plaintiffs claim that Defendants violated the IWPCA. *Id.* at 14-15. (Plaintiffs also seek costs and fees. *Id.* at 15. That request is denied without prejudice as premature given that summary judgment is granted only in part.)

## I.       FLSA and IMWL Claims

### A.       Production Bonus Pay Method

Section 7(a)(1) of the FLSA prohibits employers from having an employee work more than forty hours per week "unless such employee receives compensation for his employment in excess of [40] hours … at a rate not less than one and one-half times the regular rate at which he is employed."  29 U.S.C. § 207(a)(1); *see Urnikis-Negro v. Am. Family Prop. Servs.*, 616 F.3d 665, 672-73 (7th Cir. 2010) ("Section 7(a)(1) of the FLSA sets the maximum regular workweek at 40 hours and entitles a nonexempt employee to overtime pay for any hours beyond that number ….").  An employee's "regular rate" is defined "to include all remuneration for employment paid to, or on behalf of, the employee," with certain exceptions not relevant here. 29 U.S.C. § 207(e).  Similarly, under the IMWL, "no employer shall employ any of his employees for a workweek of more than 40 hours unless such employee receives compensation for his employment in excess of [40 hours] at a rate not less than 1 1/2 times the regular rate at which he is employed."  820 ILCS 105/4a(1).  Illinois regulations further provide that "[t]he 'regular rate' shall be deemed to include all remuneration for employment paid to, or on behalf of, the employee."  56 Ill. Admin. Code § 210.410.  Given the significant substantive overlap between the FLSA and the IMWL, and given the parties' agreement that analysis under the two statutes is identical, Doc. 97 at 4; Doc. 112 at 6 n.1, the FLSA and IMWL claims are subject to the same analysis.  *See Condo v. Sysco Corp.*, 1 F.3d 599, 601 n.3 (7th Cir. 1993) (treating claims brought under the FLSA and the IMWL as interchangeable where the "parties agree[d] that § 7(a)(1) of the FLSA and § 4a(1) of the Illinois Minimum Wage Law are coextensive"); *Kerbes v. Raceway Assocs., LLC*, 961 N.E.2d 865, 871 (Ill. App. 2011) ("In light of the paucity of authority directly considering section 4a of the Minimum Wage Law and its implementing

regulations, we will similarly consider the FLSA, its implementing regulations, and relevant interpretive case law."); *see also* 56 Ill. Admin. Code § 210.120 ("For guidance in the interpretation of the [IMWL] and this Part, the Director may refer to the Regulations and Interpretations of the Administrator, Wage and Hour Division, U.S. Department of Labor, administering the Fair Labor Standards Act of 1938, as amended.") (citation omitted).

The Seventh Circuit has called an employee's regular rate the "keystone" of FLSA's overtime provision: "On that depends the amount of overtime payments which are necessary to effectuate the statutory purposes. The proper determination of that rate is therefore of prime importance." *Urnikis-Negro*, 616 F.3d at 673 (internal quotation marks omitted). Determining an employee's "regular rate" when he receives a fixed hourly wage is straightforward; the two are equivalent. *See* 29 C.F.R. § 778.110(a) ("If the employee is employed solely on the basis of a single hourly rate, the hourly rate is the 'regular rate.'"); 56 Ill. Admin. Code § 210.430(a) (same). Calculating the regular rate is more complicated where, as here, employees are paid under a hybrid system. Two Supreme Court cases address the legality of similar wage schemes under the FLSA.

In *Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419 (1945), a lumber manufacturer guaranteed its employees a base pay rate of 35 cents per hour. *Id*. at 422. But it also alternatively calculated their pay on a piece rate basis of "80 cents per thousand board feet of lumber stacked and 70 cents per thousand board feet of lumber ricked." *Id*. at 422-23. Employees received the higher gross pay of the two methods—if the piece rate method yielded higher compensation than the base pay method, then the employee would be compensated under the piece rate method, and vice versa.

The lumber manufacturer argued that its employees' "regular rate" was 35 cents per hour and their overtime rate was 52.5 cents per hour, and therefore that so long as they earned more than 52.5 cents per hour under the piecework compensation scheme, their pay complied with the FLSA. *Id*. at 423. The Supreme Court disagreed, holding that the regular rate for purposes of the FLSA had to be based on actual compensation. The Court explained:

> The 35-cent per hour 'regular rate' fixed by the contracts is obviously an artificial one, however bona fide it may have been in origin. Except in the extremely unlikely situation of the piece work wages falling below a 35-cent per hour figure, this 'regular rate' is never actually paid. In the normal case where the stackers earn more than 35 cents per hour on the piece rate basis during non-overtime hours, they are guaranteed this higher figure and are actually so compensated. And even when the stackers work overtime they actually receive at the present time an average of 59 cents an hour under the guaranteed piece rate system rather than one and one-half times the 35-cent 'regular rate.'

*Id*. at 425-26.

Similarly, in *Walling v. Harnischfeger Corp.*, 325 U.S. 427 (1945), a firm paid its employees under the following method:

> As a result of collective bargaining by their union, these employees entered into a collective agreement with respondent whereby they are each paid a basic hourly rate plus an 'incentive bonus' or 'piecework earnings.' The various jobs performed by these incentive workers are 'time studied' by the management. The time which the job is shown to consume is multiplied by a 'standard earning rate' per unit of time. The amount so obtained is known as the 'price' placed on that job. When an employee is given work on a job that has been so priced, he receives a job card bearing the price.
>
> The worker is paid his agreed base or hourly rate (ranging from 55 cents to $1.05 per hour) for the time which he takes to perform the job. If the job price exceeds this base pay, he ultimately receives the difference between the two amounts. The excess of the job price over the hourly earnings is known as an 'incentive bonus' or 'piecework earnings.' Thus the sooner a job is completed the greater will be this incentive bonus. When the job price is smaller than the hourly earnings the employee receives only the hourly rate for the time worked, being assured of that rate regardless of his efficiency or speed. About 98.5% of the incentive workers, however, work with sufficient efficiency and speed to earn compensation over and above their base pay.

*Id*. at 428-29 (footnote omitted).  When employees worked overtime, "they receive[d] a premium of 50% of the basic hourly rate," but the overtime premium did "not reflect the incentive bonuses received."  *Id*. at 429.  The Court again held that the employees' regular rate had to be calculated from their *actual* piecework wages and not from the guaranteed base pay rate:

> Once the parties agree that these employees should receive such piece work wages, those wages automatically enter into the computation of the regular rate for purposes of Section 7(a) regardless of any contract provision to the contrary.  Moreover, where the facts do not permit it, we cannot arbitrarily divide bonuses or piece work wages into regular and overtime segments, thereby creating an artificial compliance with Section 7(a).
>
> It matters not how significant the basic hourly rates may be in determining the compensation in situations where incentive bonuses are not paid.  When employees do earn more than the basic hourly rates because of the operation of the incentive bonus plan the basic rates lose their significance in determining the actual rate of compensation.

*Id*. at 432.

Federal and Illinois regulations have adopted the Supreme Court's approach for determining the regular rate for an employee paid on a piece rate basis.  *See* 29 C.F.R. § 778.111 ("When an employee is employed on a piece-rate basis, the regular hourly rate of pay is computed by adding together total earnings for the workweek from piece rates and all other sources (such as production bonuses) and any sums paid for waiting time or other hours worked (except statutory exclusions).  This sum is then divided by the number of hours worked in the week for which such compensation was paid, to yield the pieceworker's 'regular rate' for that week."); 56 Ill. Admin. Code § 210.430(b) (same, with minor variations of phrasing).

W&E's compensation method here operated similarly to the methods in *Youngerman-Reynolds* and, in particular, *Harnischfeger*.  W&E technicians were guaranteed base pay determined by an hourly rate, but their actual pay was generally higher because they also routinely received "bonus pay," which was based (in part) on how many tasks they completed

that week.  Unlike the employers in *Harnischfeger* and *Youngerman-Reynolds*, W&E paid its employees an overtime premium for both their base pay and their bonus pay.  At first glance, then, it would seem that W&E's method complies with the FLSA.  But the way W&E calculated the regular rate ultimately undervalued its employees' overtime wages.

Consider again the hypothetical technician discussed above.  Because her piece wages (which W&E refers to as her Gross Jobcode Production) are $1000, her regular rate would be $20 per hour because she earned that $1000 through work performed over the course of fifty hours.  For her first forty hours of work, then, she should earn $800; and because she worked ten overtime hours, she should earn $300 in overtime, yielding total gross pay of $1100.  But under W&E's method, the technician's gross pay is only $1045.  As a result, the production bonus pay method does not pay her as much as the FLSA requires.

W&E argues that this mischaracterizes its pay method.  Doc. 112 at 13.  In W&E's view, technicians were not paid on a piece rate basis; rather they were compensated on an hourly basis and received a bonus based on the number of jobs performed.  *Ibid*.  W&E therefore insists that the $1000 of Gross Jobcode Production is not actually pay for the hypothetical employee, but rather is an intermediate figure used internally to determine the employee's weekly bonus based on her productivity.  *Ibid*.  According to W&E, then, the hypothetical employee's total pay (prior to overtime) should be $500 base pay plus the $450 production bonus, for a total of $950.  If that were the case, her regular rate would be $19 per hour, and her $1045 gross pay for fifty hours of work would comply with the FLSA.

Although W&E's position has intuitive appeal, it runs afoul of the Department of Labor regulations and, in particular, its definition of the term "bonus."  *See* 29 C.F.R. § 778.502(d) ("The term ['bonus'] is improperly applied if it is used to designate a portion of regular wages

which the employee is entitled to receive under his regular wage contract.").  Those regulations

expressly prohibit W&E's workaround:

> Similar schemes have been devised for piece-rate employees. … An employee
> is assigned an arbitrary hourly rate (usually the minimum) and it is agreed that
> his straight-time and overtime earnings will be computed on this rate but that
> if these earnings do not amount to the sum he would have earned had his
> earnings been computed on a piece-rate basis of "x" cents per piece, he will be
> paid the difference as a "bonus."  The subterfuge does not serve to conceal the
> fact that this employee is actually compensated on a piece-rate basis, that
> there is no bonus and his regular rate is the quotient of piece-rate earnings
> divided by hours worked.

*Ibid*.  And "[t]he situation is in no way bettered if the employer, standing by the logic of his

labels, proceeds to compute and pay overtime compensation due on this 'bonus' by prorating it

back over the hours of the workweek."  *Id*. § 778.502(b).  Defendants do not challenge those

regulations on *Chevron* grounds, *see Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467

U.S. 837 (1984), and thus have forfeited any such argument.  *See Nichols v. Mich. City Plant

Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any

arguments that were not raised in its response to the moving party's motion for summary

judgment."); *G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("We

have repeatedly held that a party waives an argument by failing to make it before the district

court."); *Salas v. Wis. Dep't of Corr.*, 493 F.3d 913, 924 (7th Cir. 2007) ("[A] party forfeits any

argument it fails to raise in a brief opposing summary judgment.").

It is true that the piecework rates under either W&E's jobcode system or its point system

are affected by a technician's efficiency grade for the week.  However, the mere fact that the rate

at which a worker is paid may vary does not change the basic reality that he is compensated for

each task completed, which is the *sine qua non* of a piece rate pay system.  *See Black's Law

Dictionary* 1332 (10th ed. 2014) (defining piecework as "[w]ork done or paid for by the piece or

job").  And even W&E, while not conceding that it compensates its employees as pieceworkers, acknowledges that its system "is similar to a piece rate" pay method.  Doc. 99-1 at 12.

Moreover, Defendants concede that "(with very rare exceptions) all bonus-eligible technicians earned production bonuses each week," Doc. 112 at 13, which the record confirms, Doc. 98-6 at 706-726.  That fact underscores this case's similarity to *Harnischfeger*, where the supposed "bonus" was earned more than 98 percent of time.  325 U.S. at 429.  It also fatally undermines Defendants' protestations that Gross Jobcode Production was merely "a nominal value used to calculate a bonus."  Doc. 112 at 13.  In fact, it is the hourly wage, not the Gross Jobcode Production, that was for all intents and purposes nominal: with very rare exceptions, the hourly wage was never actually paid to the worker.  Rather, the calculation of hourly "wages"— followed first by the awarding of overtime and only then by subtracting the resulting figure from Gross Jobcode Production to calculate a "bonus"—had little real-world significance other than carving a slice out of the employee's piecework earnings, on which overtime would not be paid.

To see how, consider our hypothetical employee again.  W&E's payment system effectively divides her Gross Jobcode Production—which, to be clear, is the amount that would otherwise be her straightforward piecework earnings for the week, but for the "hourly pay" wrinkle—into three tranches: (1) $500 that is nominally her "hourly" earnings at her regular "wage," *i.e.*, $10 per hour for the 50 hours she worked; (2) $50 of additional overtime compensation that W&E nominally "pays" her on that amount; and (3) whatever is left over once the first two tranches are subtracted, which W&E labels a "production bonus."  The employee receives overtime compensation only on the first and third tranches of her earnings; the second tranche—because it has been arbitrarily labelled overtime compensation for the first tranche—is treated as income on which no overtime is due.

To find that approach legitimate, the court would have to accept the hourly rate calculation as the real-world workhorse of the scheme. But that is not a frame of reference the record permits. Where, as here, a scheme included two alternative calculations, one piecework-based and the other hourly, and the piecework-based option routinely dwarfs the employee's supposed hourly pay, the court must treat the system like a piecework scheme to ensure faithful compliance with the FLSA. *See Harnischfeger*, 325 U.S. at 432 ("When employees do earn more than the basic hourly rates because of the operation of the incentive bonus plan the basic rates lose their significance in determining the actual rate of compensation.").

Accordingly, the production bonus pay method miscalculated the regular rate and thereby resulted in W&E paying Plaintiffs less overtime compensation than the FLSA and the IMWL required. Summary judgment is thus granted on Plaintiffs' claims to the extent they challenge the production bonus pay method formula.

**B.** **Time Spent Retrieving and Returning Equipment**

Next, Plaintiffs claim they should have been compensated for time spent at the W&E warehouse. Doc. 97 at 9-11. "The employee bears the burden of proving that she performed overtime work for which she was not properly compensated," while the "employer bears the burden to establish that an exemption from the FLSA applies." *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 173 (7th Cir. 2011). "Work not requested but suffered or permitted is work time," but only if the "employer knows or has reason to believe that [the employee] is continuing to work." 29 C.F.R. § 785.11; *see Kellar*, 664 F.3d at 177 (requiring FLSA plaintiffs to show that the employer "had actual or constructive knowledge of [the] overtime work"). That said, "it is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed. … The mere promulgation of a rule against such work is not

enough. Management has the power to enforce the rule and must make every effort to do so." 29 C.F.R. § 785.13. The FLSA obligates employers to "make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him." 29 U.S.C. § 211(c); *see also* 820 ILCS 105/8 (imposing similar recordkeeping requirements).

For Plaintiffs' pre-December 2013 claims, the following facts are undisputed or must be assumed: (1) Plaintiffs were compensated only for the time they logged on-site through TechNet and for their classroom and field training, Doc. 109 at ¶ 30; Doc. 98-6 at 284-85; (2) on some days, prior to traveling to their first job location, Plaintiffs had to go to W&E's warehouse to pick up equipment for the day or to return equipment from the previous day, Doc. 109 at ¶¶ 8, 10; and (3) W&E technicians are entitled to compensation for the time spent at the warehouse picking up and returning equipment, *id.* at ¶ 25; Doc. 98-5 at 234-235. Defendants make no legal argument that this time was incidental to Plaintiffs' principal duties. Nor do Defendants argue that they did not know that Plaintiffs had to report to the warehouse to retrieve or return their equipment. Instead, Defendants argue that Plaintiffs bear responsibility for not accurately recording their hours and for not complaining to management. Doc. 112 at 15-17.

Both arguments are unavailing. The reason Plaintiffs were underpaid is not because they did not record their time—it is because, prior to December 2013, Defendants populated employees' timesheets only with the hours logged on TechNet and not the hours reflected by the paper sign-in sheets at the warehouse. Defendants insist that "a realistic appraisal of psychological tendencies and human weakness" makes it "implausible that Plaintiffs would work for free and without complaint," *id.* at 17, but that is beside the point. Defendants do not dispute, much less cite record evidence disproving, that this work was performed and should have been

paid for. And the law places on the employer the burden of ensuring that its employees are compensated for all work of which is has knowledge.

On this record, then, there is no dispute of fact that Defendants failed to include time that Plaintiffs worked. Accordingly, summary judgment is granted on Plaintiffs' FLSA and IMWL claims to the extent they seek compensation for time spent collecting and returning equipment before December 2013.

## C. Timesheet Audits

The final component of Plaintiffs' overtime claims is that W&E's audits of their timesheets artificially decreased their hours. Doc. 97 at 9-11. As noted, each week Sandra reviewed each technician's hours as logged through PenguinData's mobile app and adjusted those hours as she thought necessary—for example, by automatically deducting an hour for lunch when a technician worked more than six hours. Sandra testified that whenever she reduced an employee's recorded hours, she would later confirm, either with the employee, a dispatcher, or a manager, how many hours that employee actually worked. In other words, Sandra testified that the results of her audit reflect the true hours that Plaintiffs worked. Although Plaintiffs believe to the contrary that their logged hours are accurate and Sandra is lying, misremembering, or relied on mistaken sources, Doc. 98 at ¶ 27, this dispute over a material fact precludes summary judgment on this claim.

## D. Individual Liability

Plaintiffs submit that Jorge is individually liable as an "employer" under both the FLSA and the IMWL. The FLSA defines "employer" to include "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). An employer under the IMWL likewise includes "any person … acting directly or indirectly in the

interest of an employer in relation to an employee." 820 ILCS 105/3. The Seventh Circuit has

interpreted the FLSA's definition of employer to include "the supervisor who uses his authority

over the employees whom he supervises to violate their rights." *Luder v. Endicott*, 253 F.3d

1020, 1022 (7th Cir. 2001); *see also Riordan v. Kempiners*, 831 F.2d 690, 694 (7th Cir. 1987)

(holding that the FLSA permits "naming another employee rather than the employer as

defendant, provided the defendant had supervisory authority over the complaining employee and

was responsible in whole or part for the alleged violation").

Jorge does not dispute that he qualifies as an employer under these statutes, and he

therefore has forfeited any such argument. *See Nichols*, 755 F.3d at 600; *G & S Holdings*, 697

F.3d at 538; *Salas*, 493 F.3d at 924. In any event, Jorge most certainly meets the statutes' broad

definition of employer. As noted, Jorge was a supervisor with the authority to hire and fire

employees; for a period of time, he was in charge of the company's finances; and he held himself

out as W&E's president. For these reasons, Jorge is an employer under both statutes.

### E.      Statute of Limitations

The statute of limitations under the IMWL is three years. *See* 820 ILCS 105/12(a)

("Every such action shall be brought within 3 years from the date of the underpayment"). Under

the FLSA, the presumptive statute of limitations is two years; however, the limitations period is

three years if the employer willfully violates the statute. *See* 29 U.S.C. § 255(a) (FLSA actions

for unpaid wages "shall be barred forever unless commenced within two years after the cause of

action accrued, except that a cause of action arising out of a willful violation may be commenced

within three years"). An employer's conduct is "willful" under the FLSA if it "either knew or

showed reckless disregard for the matter of whether its conduct was prohibited by the statute."

*McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). Federal regulations define reckless

disregard to mean the "failure to make adequate inquiry into whether conduct is in compliance with the Act." 5 C.F.R. § 551.104.

Plaintiffs urge the court to apply the three-year limitations period to their FLSA claims. Doc. 97 at 12-13. As to the production bonus pay method, Plaintiffs assert that "Defendants simply implemented the compensation scheme and blindly adhered to the advice" of PenguinData officers, who are not attorneys. Doc. 97 at 13. But whether Defendants' inquiry was adequate such that their violations were not willful is a question of fact. *See Steele v. Leasing Enters., Ltd.*, 826 F.3d 237, 248 (5th Cir. 2016) (holding that willfulness under the FLSA is a question of fact); *Pignataro v. Port Auth. of N.Y. & N.J.*, 593 F.3d 265, 273 (3d. Cir. 2010) (same). It therefore cannot be resolved on summary judgment. As to the failure to compensate Plaintiffs for time spent picking up and returning equipment, neither party presents evidence on the willfulness issue. Doc. 97 at 13; Doc. 112 at 19-21. Accordingly, the court cannot find as a matter of law that Defendants knew or showed reckless disregard for whether the FLSA prohibited its conduct, and therefore cannot hold on summary judgment that the three-year limitations period applies to the FLSA claims.

### F.     Liquidated Damages

Plaintiffs also ask the court to hold that they are entitled to liquidated damages. Doc. 97 at 13-14. The FLSA mandates liquidated damages in an amount equal to the employees' monetary damages. *See* 29 U.S.C. § 216(b) ("Any employer who violates … section 207 of this title shall be liable to the employee or employees affected in the amount of … their unpaid overtime compensation … and in an additional equal amount as liquidated damages."). But the court may, in its discretion, reduce the liquidated damages (or award none at all) "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in

good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act." *Id*. § 260. "The employer bears a substantial burden in showing that it acted reasonably and with good faith." *Bankston v. Illinois*, 60 F.3d 1249, 1254 (7th Cir. 1995). The employer may do so through evidence showing "that it had an honest intention to ascertain what the [FLSA] requires and to act in accordance with it." *Id*. at 1255 (alteration in original).

Because Defendants presented evidence that they asked PenguinData about the legality of the production bonus pay method, the court cannot find as a matter of law that they fail to qualify for the good faith defense as to that compensation system. *See Davis v. Richland Maintenance, Inc.*, 2015 WL 8958883, at *9 (E.D. Mich. Dec. 16, 2015) (evidence that "as part of his investigation into changing [the defendant's] payment model, [the defendant's president] spoke with other contractors and his business partner" indicated good faith, even though the company never "sought specific legal advice from an attorney"). But as to the failure to compensate for the time spent retrieving and returning equipment, Defendants have presented no evidence that would allow a reasonable jury to find that their failure was reasonable. Because, unlike with the willfulness inquiry, Defendants bear the burden of showing that they qualify for the good faith reduction in liquidated damages, their failure to present evidence means that they cannot prevail on this issue. *See Bankston*, 60 F.3d at 1254 ("It is easier for a plaintiff to receive liquidated damages under the FLSA than it is to extend the statute of limitations for FLSA claims."). Accordingly, Plaintiffs are entitled to summary judgment on the question whether Defendants are entitled to the good faith reduction or elimination of liquidated damages for their failures to compensate for time spent retrieving or returning equipment.

## II.    IWPCA Claim

The IWPCA prohibits employers from making deductions from an employee's final compensation or wages "unless such deductions are … made with the express written consent of the employee, given freely at the time the deduction is made."  820 ILCS 115/9.  Plaintiffs argue for summary judgment on this claim because Defendants never produced any written, contemporaneous consent forms authorizing them to make deductions from Plaintiffs' paychecks.  Doc. 97 at 14-15.

As discussed above, Sandra declared under oath that she *did* obtain written authorizations from Plaintiffs, but was unable to locate them.  Plaintiffs submit that Sandra's averment "does not create an issue of material fact sufficient to defeat summary judgment" because the IWPCA "requires evidence of a contemporaneous written authorization for all deductions."  Doc. 123 at 9.  But Sandra's declaration *is* evidence of the written authorizations, and a reasonable jury could conclude that she properly obtained Plaintiffs' consent before making any deductions.  Accordingly, summary judgment on this claim is denied.

## III.    Defendants' Motion to Decertify the Collective

As noted, the court earlier denied Defendants' motion to decertify the FLSA collective.  Doc. 184.  The court stated its reasons on the record, and now further elaborates on its reasoning.

The FLSA authorizes employees to bring a collective action on behalf of themselves and "other employees similarly situated."  29 U.S.C. § 216(b).  The statute provides no standard for determining when a FLSA plaintiff's coworkers are "similarly situated"—a problem that has plagued federal courts.  *See* 7B Charles Alan Wright, Arthur R. Miller & Mary K. Kane, Federal Practice & Procedure § 1807 (3d ed. 2005) (discussing the divergent approaches that courts have taken in deciding whether to certify FLSA collective actions).

In *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 772 (7th Cir. 2013), a case involving both a § 216(b) collective action and a Civil Rule 23 state law class action, the Seventh Circuit strongly suggested that FLSA collective actions must satisfy the same requirements as Rule 23 class actions:

> The only difference of moment between the two types of action is that in a collective action the members of the class (of the "collective") must opt into the suit to be bound by the judgment or settlement in it, while in a class action governed by Rule 23(b)(3) (a class action seeking damages) they must opt out *not* to be bound. That difference can have consequences, the obvious one being the need to protect the right of Rule 23(b)(3) class members to opt out. But none of the consequences bears on this case. Indeed, despite the difference between a collective action and a class action and the absence from the collective-action section of the Fair Labor Standards Act of the kind of detailed procedural provisions found in Rule 23, there isn't a good reason to have different standards for the certification of the two different types of action, and the case law has largely merged the standards, though with some terminological differences. Simplification is desirable in law, especially in the present context, because joining a collective action and a class action or actions in one suit, as in this case, is both common and, we have held, permissible.
>
> It is true that one function of the procedural provisions in Rule 23 is to protect the rights of unnamed class members, who need such protection because unless they are permitted to and do opt out of the class they will be bound by the judgment or settlement. In contrast, collective actions bind only opt-ins. But the provisions of Rule 23 are intended to promote efficiency as well, and in that regard are as relevant to collective actions as to class actions. And so we can, with no distortion of our analysis, treat the entire set of suits before us as if it were a single class action.

*Id.* at 771-72 (citations omitted).

Whether *Espenscheid* effectively merged the standards for FLSA collective actions and Rule 23 class actions is subject to debate. *Compare*, *e.g.*, *Smith v. Family Video Movie Club, Inc.*, 2015 WL 1542649, at *3 n.3 (N.D. Ill. Mar. 31, 2015) (declining to read *Espenscheid* to require courts to "follow wholesale the Rule 23 framework in analyzing FLSA actions"), *with Dailey v. Groupon, Inc.*, 2014 WL 4379232, at *4 (N.D. Ill. Aug. 27, 2014) (interpreting *Espenscheid* as requiring that FLSA collective actions and Rule 23 class actions "be treated the

same for purposes of certification"). And since *Espenscheid* was decided, the Supreme Court has expressed its doubts that FLSA collective actions and Rule 23 class actions can be treated interchangeably. *See Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523, 1527 n.1 (2013) ("While we do not express an opinion on the propriety of th[e] use of class-action nomenclature [in FLSA collective actions], we do note that there are significant differences between certification under Federal Rule of Civil Procedure 23 and the joinder process under § 216(b)."); *see also id*. at 1529 (refusing to rely on class action precedents in part "because Rule 23 actions are fundamentally different from collective actions under the FLSA").

But there is no need here to decide how, if at all, the two standards differ. In *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016), the Supreme Court addressed an employer's challenge to the certification of a Rule 23 class and a FLSA collective. *Id*. at 1045. The parties in *Bouaphakeo* did "not dispute that the standard for certifying a collective action under the FLSA is no more stringent than the standard for certifying a class under the Federal Rules of Civil Procedure." *Ibid*. The Supreme Court therefore assumed, without deciding, that "if certification of respondents' class action under the Federal Rules was proper, certification of the collective action was proper as well." *Ibid*. The same holds true here, as neither party asserts that the FLSA's collective action requirements are more demanding than Rule 23's class action requirements. Doc. 99-1 at 9-10 (arguing that the standards are the same); Doc. 115 at 5-6 (arguing for a FLSA standard that would be more lenient than the Rule 23 standard). Given the parties' framing of the question, and in light of *Espenscheid*'s and *Bouaphakeo*'s treatment of this issue, the court will assume for argument's sake that the FLSA collective action is viable so long as it satisfies Rule 23.

Defendants believe that the FLSA collective must be decertified because it fails to satisfy Rule 23's commonality and predominance requirements. Doc. 99-1 at 9-14. As to commonality, Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The Supreme Court has held that the "common contention … must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "What matters to class certification," the Court continued, "is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Ibid.* (internal quotation marks omitted).

As to predominance, a class in a damages suit may be maintained if "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). In describing the predominance inquiry, the Seventh Circuit has said:

> [The] predominance requirement is meant to test whether proposed classes are sufficiently cohesive to warrant adjudication by representation, but it scarcely demands commonality as to all questions. In particular, when adjudication of questions of liability common to the class will achieve economies of time and expense, the predominance standard is generally satisfied even if damages are not provable in the aggregate.

*Chi. Teachers Union, Local No. 1 v. Bd. of Educ.*, 797 F.3d 426, 443-44 (7th Cir. 2015) (quoting *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1436-37 (2013)) (internal quotation marks omitted); *see also Bouaphakeo*, 136 S. Ct. at 1045 ("When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.") (internal

quotation marks omitted). Because commonality and predominance may in some cases "overlap in ways that make them difficult to analyze separately," *Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 374 (7th Cir. 2015), they often are addressed together. That said, "the predominance criterion is far more demanding" than Rule 23(a)'s commonality requirement. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 814 (7th Cir. 2012) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).

Defendants assume, without conceding, that Plaintiffs' FLSA claim presents common questions of liability. Doc. 99-1 at 11. That assumption is correct. The questions are: (1) whether W&E's production bonus pay formula deprived Plaintiffs of their lawful overtime earnings; (2) whether W&E's timesheet auditing practices caused Plaintiffs to be undercompensated for their work; and (3) whether Plaintiffs should have been paid during the pre-December 2013 period for the time spent picking up and returning equipment. The answers to those questions can resolve liability on the central issues of Plaintiffs' FLSA claims' "in one stroke." *Wal-Mart*, 564 U.S. at 350. On each question, Defendants are liable either to no member of the collective or to all.

Having assumed that there are common questions of liability, Defendants instead argue that decertification is necessary because the relief sought (monetary damages) cannot be assessed without resorting to individualized proof. Doc. 99-1 at 10-14. In so arguing, they rely heavily on *Espenscheid*, where the Seventh Circuit addressed how difficulties in assessing damages might render class treatment inappropriate. The class in *Espenscheid* consisted of 2341 technicians who, as here, alleged that they were not fully compensated for their work. 705 F.3d at 772-73. The court affirmed the district court's decertification of the class because the variance in damages made class litigation infeasible:

> [T]o determine damages would, it turns out, require 2341 separate evidentiary
> hearings, which might swamp the Western District of Wisconsin with its two
> district judges.  For it's not as if each technician worked from 8 a.m. to 5 p.m.
> and was forbidden to take a lunch break and so worked a 45-hour week
> (unless he missed one or more days because of illness or some other reason)
> but was paid no overtime.  Then each technician's damages could be
> computed effortlessly, mechanically, from the number of days he worked each
> week and his hourly wage.  And when it appear[s] that the calculation of
> monetary relief will be mechanical, formulaic, a task not for a trier of fact but
> for a computer program, so that there is no need for notice …, the district
> court can award that relief without terminating the class action and leaving the
> class members to their own devices.  Nothing like that is possible here.

*Id*. at 773 (second and third alterations in original) (citations and internal quotation marks

omitted).  The *Espenscheid* plaintiffs thought they could avoid this problem by presenting

testimony from 42 "representative" class members and then extrapolating the other class

members' damages from that sample.  *Id*. at 774.  The Seventh Circuit rejected that approach

because (1) there was no reason to think that these 42 class members would or could be a

statistically representative sample of the class, and (2) no factfinder could reasonably infer how

long one employee worked from knowing another employee's hours, given the potential variance

among class members and the difficulties posed by the available evidence.  *Id*. at 774-75.

*Espenscheid* noted that bifurcating the proceedings into two successive trials, on liability

and damages, could have ameliorated the individualized damages issue: "Bifurcation would not

eliminate variance in damages across class members, but once liability is established damages

claims can usually be settled with the aid of a special master, and trials thus avoided."  *Id*. at 775.

But class counsel opposed bifurcation, so it never came to pass.  *Id*. at 775-76.  The Seventh

Circuit further noted that, although no records existed as to the amount of time the class

members actually worked, each class member could still provide the evidence necessary to

compute damages: "The unreported time for each employee could be reconstructed from

memory, inferred from the particulars of the jobs the technicians did, or estimated in other

ways—any method that enables the trier of fact to draw a 'just and reasonable inference' concerning the amount of time the employee had worked would suffice." *Id*. at 775. But the plaintiffs refused to suggest a feasible course for determining damages. *Id*. at 775-76. "Essentially [the plaintiffs] asked the district judge to embark on a shapeless, freewheeling trial that would combine liability and damages and would be virtually evidence-free so far as damages were concerned." *Id*. at 776. This, the Seventh Circuit held, was impermissible, warranting decertification.

*Espenscheid* stands for the proposition that, when individualized hearings would prove impractical given the size of the class, (1) inferences cannot be drawn from a small, unrepresentative sample of the class as to absent class members' damages, and (2) the plaintiffs must propose a feasible trial plan for proving damages even when the damages vary greatly among class members. Contrary to Defendants' submission, what *Espenscheid* does not hold is that individualized damages are fatal to a class. In fact, the Seventh Circuit has held precisely the opposite:

> It would drive a stake through the heart of the class action device, in cases in which damages were sought rather than an injunction or a declaratory judgment, to require that every member of the class have identical damages. If the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification. Otherwise defendants would be able to escape liability for tortious harms of enormous aggregate magnitude but so widely distributed as not to be remediable in individual suits.

*Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013).

*Espenscheid* does not preclude certification here because the feasibility concerns that animated that decision are absent. There are at most 45 *total* members of the FLSA collective— far fewer than the 2341 class members in *Espenscheid*, and roughly the same as the number of

plaintiffs whose testimony would have served as a sample for the entire class in that case. Doc. 76. The small size of the collective makes individual damages hearings a more practical option. In fact, 27 members of the collective—nearly two-thirds—have already submitted sworn declarations indicating how many hours they worked and the ways in which W&E's timesheets failed to reflect their hours. Doc. 98-4.

Given the common questions of liability, and the fact that adjudicating those common questions as a collective would "achieve economies of time and expense," the commonality and predominance requirements are both satisfied even despite the fact that "damages are not provable in the aggregate." *Chi. Teachers Union*, 797 F.3d at 444. Therefore, it would be premature to decertify the collective at this stage, when Plaintiffs' plan to prove damages is unclear. The court's denial of Defendants' motion to decertify is without prejudice, however. As the trial date approaches, if Plaintiffs have offered no feasible plan for determining damages that satisfies governing law, Defendants may renew their motion.

## Conclusion

For the foregoing reasons, Plaintiffs' motion to strike Defendants' declarations, Doc. 120, is denied; Defendants' motion to strike Plaintiffs' objections and for leave to amend its Local Rule 56.1 materials, Doc. 132, is denied as moot; Defendants' motion to decertify the collective, Doc. 99, is denied without prejudice; and Plaintiffs' summary judgment motion, Doc. 96, is granted in part and denied in part. Specifically, summary judgment is granted as to Plaintiffs' claims that: (1) W&E's bonus pay calculation system and failure to credit time spent collecting and returning equipment violated the FLSA and IMWL; (2) Jorge Chirinos is liable as an employer; and (3) Plaintiffs are entitled to liquidated damages for Defendants' not compensating them for collecting and returning equipment. Summary judgment is denied as to Plaintiffs'

claims that: (4) W&E's timesheet audits violated the FLSA and the IMWL; (5) Defendants' FLSA violations were willful for purposes of the statute of limitations; (6) Plaintiffs are entitled to liquidated damages for Defendants' adoption of the PenguinData system; (7) Defendants violated the IWPCA; and (8) Plaintiffs are entitled to fees and costs.

September 30, 2016

_____
United States District Judge